☑ Original ☐ Duplica

CLERK'S OFFICE
A TRUE COPY
Dec 09, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No.   25   MJ   214 |
| the person of William C. Adams and devices in ) | |
| his possession, including iPhone 12 Pro Max ) | |
| bearing phone number 262-393-9421 ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     12/23/2025     *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Honorable William E. Duffin     .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     12/09/2025 at 10:10 a.m.          *William E. Duffin*
                                                                                *Judge's signature*

City and state:     Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
                                                                            *Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

The person to be searched is William C. Adams. The property to be searched is an Apple iPhone 12 Pro Max bearing cell phone number 262-393-9421, as well as any other devices located in the possession of William C. Adams.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of Title 18, United States Code, Sections 1591(a)(1), (b)(1) and (b)(2) (sex trafficking of a child and/or by force, fraud, or coercion); 1591(d) (obstruction or interference with sex trafficking enforcement); 1594(c) (conspiracy to commit sex trafficking); and 2421(a) (interstate transportation for prostitution)and involve Willaim C. Adams since January 1, 2009, including:

    a.   All stored electronic communications, including email, instant messaging, text messaging, multimedia messaging, and communications in third party apps;

    b.   All contact lists and records of communications with those contacts, including call logs and written messages of any kind;

    c.   All images, videos, travel records, information related to the identity of victims, and any other content or records on the phone.

    d.   All photographs or videos;

    e.   All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, and Internet Protocol addresses;

    f.   All web browsing history;

    g.   Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, and saved usernames and passwords.

      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of William C. Adams to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face of William C. Adams and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

CLERK'S OFFICE
A TRUE COPY
Dec 09, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**the person of William C. Adams and devices in his<br>possession, including iPhone 12 Pro Max bearing<br>phone number 262-393-9421** | )<br>)<br>)<br>)<br>)<br>)    Case No.   25    MJ    214 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the    Eastern    District of    Wisconsin   , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   ❐ evidence of a crime;

   ❐ contraband, fruits of crime, or other items illegally possessed;

   ❐ property designed for use, intended for use, or used in committing a crime;

   ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 1591(a)(1), (b)(1) and (b)(2); 1591(d); and 2421 (a) | sex trafficking of a child and/or by force, fraud, or coercion; obstruction or interference with sex trafficking enforcement; conspiracy to commit sex trafficking; interstate transportation for prostitution |

The application is based on these facts:

Please see Affidavit.

   ☑ Continued on the attached sheet.

   ❐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Kathrine Sadler*
*Applicant's signature*

**Kathrine Sadler, Special Agent - FBI**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by   telephone   *(specify reliable electronic means).*

Date:   12/09/2025

*William E. Duffin*
*Judge's signature*

City and state:   Milwaukee, WI

**Honorable William E. Duffin, U.S. Magistrate Judge**
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF AN**</u>
<u>**APPLICATION UNDER RULE 41 FOR A**</u>
<u>**WARRANT TO SEARCH AND SEIZE**</u>

I, Kathrine Sadler, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the person of William C. Adams and seizure and examination of property—electronic devices—which are currently in the Eastern District of Wisconsin, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since May of 2019. I have been assigned to the FBI Milwaukee Child Exploitation and Human Trafficking Task Force since July 2022. My duties include investigating violations of federal law, including but not limited to offences involving coercion, enticement, and sexual exploitation of minors, forced labor, and sex trafficking. Prior to being employed as a Special Agent with the FBI, I was employed as a Staff Operations Specialist for the FBI since 2010.

3.      I have received training related to the investigation and enforcement of federal human trafficking laws. As a result of this training and my experience, I am familiar with the ways traffickers use to recruit, communicate with, control, and exploit their victims. These include posting online advertisements for commercial sex dates, communicating electronically with prospective commercial sex buyers, distributing sexually explicit images and videos of trafficking victims, and transporting victims to commercial sex dates. I have also received more

general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and processing and identification of electronic evidence.

4.     The facts of this affidavit come from my personal observations, my training and experience, information obtained from citizen witnesses, and information reported to me by other law enforcement officers in the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, "case agents," "officers," "detectives," or "investigators" refers to the federal, state, and local law enforcement officer who have participated directly in this investigation, and with whom I have acquired information from and/or had contact regarding this investigation.

5.     I have included here only the information necessary to establish probable cause. There are additional facts and information I have learned through my investigation that are not included herein.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.     The person to be searched is William C. Adams and the property to be seized and searched are any electronic devices in the possession of William C. Adams, including/as well as an Apple iPhone 12 Pro Max bearing phone number 262-393-9421, which is currently located in the Eastern District of Wisconsin.

7.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### A.     Overview

2

8.     William Clayton Adams, who goes by the nickname "Bill Bill" has been engaged in sex trafficking since at least 2009. Evidence collected from interviews, surveillance, forensic imaging of digital devices, social media and other sources has revealed that Adams recruits women and girls in Milwaukee, Wisconsin under the guise of wanting a romantic relationship with them, and by flaunting luxury goods like custom cars, designer clothing, and gold and diamond jewelry. Adams convinces his victims that they will quickly earn enough money to meet their personal goals and live the same luxurious lifestyle he does if they agree to join his "escort" business. He then sends them to states like North Dakota, South Dakota, Nebraska, Minnesota, Illinois and Florida to dance at strip clubs and perform commercial sex acts under the supervision and direction of the women who have been working for him the longest, including his "bottom bitch," a woman with the initials R.R. Adams tells the women that they must give him everything that they earn and that he will keep it safe for them until they return to Milwaukee for periodic breaks from doing "dates." In reality, however, Adams controls all of their earnings, and his victims do not see any of this money.

9.     Adams sets rules for his victims, including rules about how much money they need to earn, when they can eat or sleep, when they can return home, how often and in what manner they need to communicate with him, who else they are allowed to communicate with, and others. When his victims violate these rules, or if Adams feels they are disrespectful towards him, Adams often puts them "on punishment," including loss of "privileges," higher quotas before they can rest or return home, threats to harm or kill them or their loved ones, and/or physical violence, such as slapping, punching, and beating with objects. Adams also pressures many of his victims to have unwanted sexual intercourse with him in order to assert his dominance over them.

3

10.     Case agents have identified approximately 22 women and girls who have disclosed being trafficked by Adams, or whom other victims and witnesses have described being trafficked by Adams using force, fraud, and/or coercion. Several who have made disclosures directly to law enforcement are discussed below and referred to for their privacy and safety by the anonymizer AV (Adult Victim) followed by a number. Others who are believed to be victims but have not yet disclosed to law enforcement are referred to as AF (Adult Female) and a number. Additionally, others who are relevant to the investigation, but whose identities would reveal the identities of victims, are referred to as AF and a number

11.     The victim disclosures made during the course of this investigation have been substantially corroborated by numerous other sources of evidence, including hotel receipts, travel records, Western Union and other financial records, and messages between Adams and various victims or recruits.

12.     Other corroborative evidence has included posts Adams has made on social media. In 2015, case agents obtained federal search warrants for Adams' Facebook and Instagram accounts under the vanity name "bill.bill." Your Affiant has reviewed the results of those warrants. Your Affiant has also reviewed publicly available posts on Adams' Instagram account from more recent years. In brief, Adams uses these social media platforms to portray himself as wealthy and successful, at least in part, in an attempt to lure vulnerable women looking for financial security to work for him. Some examples include the following posts:

   a.   An Instagram post on July 6, 2015, depicting a travel jewelry case filled
        with gold and diamond jewelry and luxury watches, along with a large stack
        of $100 bills, captioned with hashtags that include "#Roadtrip,"
        "#Whocoming,"," "#moneymob," "#lookingforarichbitch" and
        "#YouGonLoveMe.":

4

 

b. An Instagram story on June 13, 2021, depicting Adams hand resting on the steering wheel of a Maybach luxury car, with two large diamond rings, a diamond-encrusted watch, and two thick diamond and gold bracelets:



c. An Instagram post on November 2, 2021, in which Adams appears to board a private jet wearing head to toe Louis Vuitton clothing and heavy jewelry, and carrying Louis Vuitton luggage, captioned "It's either I'm getting a bag or I'm blowing one," which Your Affiant knows to mean that Adams is always making a large amount of money or spending it. The post also included hashtags that include: "#louisvuitton," "#jetlife," "itsmybirthday," "#blessed," "#freegame," "#moneymob," and "#motivation."

6



13.     Adams' recruitment tactics are largely based on promoting a lifestyle that he claims is attainable only if his victims do exactly as he says. By making promises he never intends to keep, Adams manipulates women into believing they cannot function without him, enabling him to keep psychological control over them for months or for years despite the geographical distance between them—which Adams uses strategically to minimize his risk of detection by law enforcement.

14.     Adams self identifies as a "pimp," as reflected in several tattoos on his body documented by the National Crime Information Center (NCIC). These include a tattoo of a boxing or wrestling-style championship belt around his abdomen that reads "CHAMPION PIMP" and "HEAVYWEIGHT" in the center, along with the text "FOR PIMPING AT ITS

7

FINEST" on one side, and a tattoo on his left forearm that reads "PIMP HARD" with images of two naked women. These are partially depicted in the selfie-style image below, taken from an iPhone belonging to Adams that was seized and searched pursuant to a state search warrant in 2015. The image has been cropped, brightened, and inverted for ease of reading:



15.      Adams also identifies as a pimp by wearing jewelry indicating such. On November 12, 2015, a federal search warrant was executed at Adams residence located at 4045 N. 44th Street, Milwaukee. During the search warrant, photos were found and seized. One of the photos show Adams wearing a large gold medallion with the caption "Pimp Hard" as seen in the photo below.

8



16.      Adams has also referred to himself as a pimp when exerting control over the women who work for him. For example, Your Affiant has reviewed text messages found in an iPhone used by Adams that was seized and searched pursuant to a state search warrant in November 2015. On August 20, 2015, Adams sent a text message to R.R., telling her, "For the move you pull tonight you can come back September 20th." Your Affiant knows R.R. to be Adams' longtime "bottom bitch," meaning the woman who has worked for him performing commercial sex dates the longest, and whom he tasks with recruiting, training, collecting money

9

from, and enforcing his rules with newer victims. Your Affiant is also familiar with a disciplinary tactic frequently used by Adams, further discussed below, wherein Adams forces victims who break his rules or disrespect him to stay out of state prostituting for longer periods than initially agreed or decided. Later that day, Adams texted R.R., "I'm a pimp you weak ass black bitch you heard what I said." R.R. replied protesting that she had not done anything wrong.

17.     In some of Adams' earlier posts, prior to a probation violation arrest in December 2015, he openly boasted about being a pimp and embraced the pimping lifestyle on Facebook and Instagram. The following are some examples:

   d.   An Instagram post on December 8, 2014, of a meme depicting a woman handing a man a large stack of cash with the text, "REAL BITCH'S DO REAL THINGS!!!":



e.  An Instagram post on January 24, 2015, of a meme reading, "Stop Being A Fag AND Do Sum Hoin'.":



f.  An Instagram post on September 23, 2015, featuring black and white photos of women being slapped and the text, "If ONE MORE BITCH Tells Me She's A Pimp I'm Liable to Smack Her Stupid Ass." This post was captioned, "You fake hoes can't Mash and Crash on a bitch the way I can!!!," with the hashtags, "#youhoes," "#moneymob," "#realtalk," "#reality," "#100," and "#realshit." Your Affiant is familiar with Money Mob as a term frequently used by Milwaukee pimps to refer to their status.

11



# If ONE MORE BITCH Tells Me She's A Pimp I'm Liable To Smack Her Stupid Ass

| | |
|---|---|
| **Id** | 1080058166770892198 |
| **Taken** | 2015-09-23 01:49:48 UTC |
| **Status** | 0 - Active |
| **Url** | http://photos-b.ak.instagram.com/hphotos-ak-xft1/t51.2885-15/e35/11850267_831445140305929_1455306281_n.jpg |
| **Source** | Library |
| **Filter** | |
| | - Unknown |
| **Upload Ip** | 166.175.185.184 |
| **Is Published** | true |
| **Shared By** | true |
| **Author** | |
| **Caption** | |
| | **Id** 1080058169606241449 |
| | **Date Created** 2015-09-23 01:49:48 UTC |
| | **Status** Active |
| | **Text** You fake hoes can't Mash and Crash on a bitch the way I can!!! #youhoes #moneymob #realtalk #reality #⬜ #realshit |

g. An Instagram post on September 2, 2015, of an image with the text, "Sell more Pu$$y.":



Id    10819670289565279B2
Taken   2015-09-25 17:02:22 UTC
Status   0 - Active
Url   http://photos-b.ak.instagram.com/hphotos-ak-
xfp1/t51.2885-15/e35/11899565_4647961733070017_1413262478_n.jpg
Source   Library

h. An Instagram post on May 31, 2015 of an image with the text, "Stop liking all my pictures hoe... and chose up!!" The image was captioned "Yeah you bitch!!!! #moneymob #whitegirls #snowbunnies #realhoesonly #richniggashit #dontmissout." Your Affiant knows in her training and experience that "choosing up" refers to leaving one pimp for another, and "snow bunnies" refers to white women involved in prostitution.

13



Id  9967287811859421976
Taken  2015-05-31 02:29:11 UTC
Status  0 - Active
Url  http://photos-g.ak.instagram.com/hphotos-ak-
     xpt1/t51.2885-15/e15/11241366_383437451857566_1080751694_n.jpg
Source  Android Share Intent
Filter  - Unknown
Upload Ip  66.87.76.199
Is Published  true
Shared By  false
Author
Caption          Id  9967287833394536572
         Date Created  2015-05-31 02:29:11 UTC
               Status  Active
                 Text  Yeah you bitch!!!! #moneymob #whitegirls #snowbunnies

i.   An Instagram post on October 26, 2015, with a photo depicting Adams, wearing
     gold chains and a Gucci hat, with his palms together, captioned "Praying to the
     Pimp God!!!! No more faggot ass bitches!!!! #moneymob #noexcuses #real talk.":

14



**Id**
1104065974616948692
**Taken** 2015-10-26 04:49:02 UTC
**Status** 0 - Active
**Url** http://photos-g.ak.instagram.com/hphotos-ak-
xtf1/t51.2885-15/e35/12142411_1580792602141334_493836701_n.jpg
**Source** Saved photos album
**Filter** - Unknown
**Upload Ip** 99.96.62.180
**Is Published** true
**Shared By** true
**Author**
**Caption**                                                **Id** 1104065977536183679
**Date Created** 2015-10-26 04:49:02 UTC
**Status** Active
**Text** Praying to tha Pimp God!!!! No more faggot ass bitches!!!!
#moneymob #noexcuses #realtalk

18.     Some of Adams' more recent posts have combined these types of posts, alluding

to his status as a pimp while also displaying his wealth. For instance, on November 1, 2023,

Adams posted a story on his Instagram account showing two of Adams' luxury vehicles, a

Lamborghini and a Bentley. The story, as screenshotted below, had text superimposed on it that

said, "Paid the cost to be the boss, paid the cost to be the boss," and "Tell ya bitch drop her head,

15

there go bill.bill." Your Affiant knows in her training and experience that the latter text refers to a common rule of pimping that one pimp's victims cannot look another pimp in the eye and must lower their heads in the presence of another pimp, both out of respect and to avoid "choosing up," meaning joining the other pimp's "stable" of women, by looking at him.:



## A. Sex Trafficking of AV-1

19.     Your Affiant has conducted multiple interviews of an adult female whose identity is known to law enforcement, hereinafter referred to as AV-1.  AV-1 disclosed that she met Adams in November 2010 via Facebook through a mutual friend. At the time, AV-1 was 18 years-old and had recently run away from home. Adams had a lot of visible wealth and a glamorous lifestyle that he showed off to AV1.

20.     When AV-1 first met Adams, she had a dream of having a nail salon or a hair salon in a strip mall. Adams told AV-1 that he wanted her to be his girlfriend and that he would take care of her. He told her she was pretty and that she should earn money as an exotic dancer. Adams promised AV-1 that she would quickly be able to put together money to start her business, as well as have her own place and a car. He also promised her that even though he had other females who danced for him, AV-1 would be his "top girl."

21.     In approximately December 2010, Adams started AV-1 dancing at the Airport Lounge in Milwaukee, followed by On the Border in Franklin, Wisconsin. Adams got an apartment for AV-1 that she lived in during this time, and he also helped her to get a car, using a portion of the money she earned.

22.     Early on, AV-1 felt uncomfortable and gross dancing but thought that was just was she had to do. AV-1 was felt even more uncomfortable dancing while she was on her period. She told Adams that she felt uncomfortable, and Adams told her to just cut the string off her tampon and it would be okay. Adams also told her that "everyone" else does. When AV-1 told Adams a second time that she felt uncomfortable dancing while she was on her period, Adams became angry and verbally aggressive with her, telling her she had to do dance no matter what. Adams would tell her that it would all be worth it in the end and that they would be rich – have businesses, cars, and a house.

17

23.     While AV-1 worked at OTB, Adams presented himself as AV-1's manager and would take all the money she made. Adams required that AV-1 and the other women working for him to give him everything they earned. Adams decided, in his discretion, how that money was spent and how much of it would be used to pay for AV-1's bills and expenses.

24.     In March 2011, Adams sent AV-1 to North Dakota to dance at a club in Williston, North Dakota. AV-1 stayed in a hotel in North Dakota with R.R, another woman who AV-1 identified as Adams' "bottom bitch." As Adams' bottom, R.R. would collect money from Adams' victims, wire that money to Adams or others who collected it for him, and buy clothes, hygiene products, and food for Adams' victims.

25.     Before AV-1 left Milwaukee, Adams told her that she may have to start "seeing men" if she was not producing enough from dancing alone. During AV-1's first two weeks in North Dakota, she worked as a dancer at a club called Heartbreakers in Williston. Adams set an earning quota for AV-1 of over $1,000 per day.

26.     After that time, Adams called AV-1 saying she would need to start performing commercial sex acts in addition to dancing and that R.R. would teach her what to do. AV-1 would work a nine-hour shift at the strip club from 4 p.m. until 1 a.m. After that, she needed to be available to do sex dates. She and the other victims were allowed to sleep only after they were done conducting sex dates. In the morning, AV-1 had to work the phones, meaning setting up/scheduling sex dates again.

27.     R.R. posted online advertisements for AV-1 on the former commercial sex website Backpage.com. R.R. taught AV-1 how to pose for ad photos and took photos of AV-1. Initially, Adams approved all the photos that went into the ads. Then, R.R. posted the ads, responded to callers, and set up dates for AV-1.

18

28.     Over time, AV-1 was expected to take or find her own photos, post her own ads, and respond to calls from johns directly. Adams told her to include the verbiage "No AA" (meaning no African American clients) in the ads, and he set the prices at $300 for a half hour commercial sexual service and $150 for a "quick visit."

29.     For about a three-year period, from 2011 to 2013, AV-1 would spend about two months in Williston, North Dakota, conducting prostitution dates, then receive a "vacation" of two weeks to one month in Milwaukee, Wisconsin. These "vacations" were the only time Adams allowed AV-1 to return home, and she was not allowed to choose to go elsewhere instead.

30.     Adams required AV-1 to perform commercial sex dates for his financial benefit every day while in North Dakota. If he felt disrespected by AV-1 or AV-1 did something that angered him, Adams would extend AV-1's stay in Williston, and she would have to work longer and earn more money for Adams before being allowed to return home. AV-1 recalled making a mistake on one of her first prostitution dates when she left the money the customer paid her on the dresser and the customer took the money since she didn't hide it.

31.     Adams did not accompany AV-1 or the other victims when they went to North Dakota to work. Adams had AV-1 and the other victims wire him money via Walmart to Walmart using Money Gram. AV-1 also send him cash in packages via mail.

32.     While AV-1 was on her "vacation," she had to ask Adams for permission if she wanted to go places, such as running errands or meeting up with her friends and family. Adams placed a curfew on her and she would have to be back at her apartment by a certain time each night. Adams gave AV-1 a weekly allowance for food, gas, and general shopping.

33.     If AV-1 did not listen to Adams and follow his instructions, Adams would threaten to take away her personal belongings, such as her car or her "vacation" time in Milwaukee. AV-1

19

remembered a couple of times when she talked back to Adams and he cut her "vacation" time short, meaning she had to return to North Dakota to engage in commercial sex acts sooner.

34.　　AV-1 recalled that the first time she returned to Milwaukee for a "vacation," she found a black, curly hair in her apartment that she recognized as belonging to another of Adams' "girlfriends." When AV-1 questioned Adams about it, Adams told her to not ask her any questions about it.

35.　　AV-1 recalled asking Adams personal questions and questions regarding his "girlfriends," Adams became so angry and aggressive with AV-1 that she ran into the bathroom and locked herself inside, bracing the door with her back by pushing against the bathtub with her feet. AV-1 recalled her having to escape Adams and hide in the bathroom until he was gone occurring more than once. One time AV-1 came out of the bathroom while Adams was still in the apartment, but only after Adams promised her he wouldn't hit her.

36.　　During AV-1's "vacations," Adams would come to her apartment periodically to check on her. During these visits, Adams would reward AV-1 for earning money for him by having sex with her. Sometimes, AV-1 did not want to have sex with Adams and would tell him she was tired or on her period. Adams would not allow AV-1 to refuse him, however, and would force himself on her. These encounters caused AV-1 to fear Adams and increased his control over her.

37.　　Adding to this fear was AV-1's knowledge of Adams' violence toward the other women who worked for him. For example, Adams told AV-1 that he beat R.R. saying "I had to put my hands on her." AV-1 recalled Adams came to her apartment with blood on his white t-shirt.

38.　　Adams was violent with AV-1 on at least one occasion, when AV-1 got into a car accident. Adams came to meet AV-1 and had her follow him to an auto body shop. AV-1 tried to

20

explain to Adams that the crash was an accident, but Adams got violent with her and struck her in the head.

39.     In the early stages of their relationship, Adams would threaten AV-1 that if she left him again, he could pay someone break into her apartment and "fuck [her] with a broomstick." AV-1 believed Adams had the ability to carry out this threat due to how much money he had—that for the right price, he could find someone to do anything he wanted. Adams also threatened AV-1 that if she got a boyfriend, he would break her legs so she would never be able to dance again.

40.     Adams continually told AV-1 that she would never make it without him and that he had "raised" her, referencing their eleven-year age gap and the fact that AV-1 met Adams when she was a teenager. AV-1 bought into this indoctrination, and her strong fear of ending up with nothing made her believe that she needed to follow Adams' rules and instructions.

41.     In approximately November or December of 2011, AV-1 left Adams to be with a male she had been talking to and because she was tired of Adams controlling every aspect of her life. AV-1 moved to California with the male but ended up not getting a job and was getting stressed out because she did not have any money. Adams reached back out to her and told her to come home. A few months later, in approximately June or July of 2012, AV-1 returned to Adams. AV-1 explained that even though Adams was also abusive toward her, she believed she had no better options. AV-1 explained that going back to Adams also provided her with a sense of financial security.

42.     AV-1 continued to work for Adams in North Dakota, Iowa, Colorado, Wyoming, and Texas. If the strip clubs were slow or closed, Adams instructed AV-1 to find dates by posting on Backpage.com or approaching men in bars.

21

43.     Your Affiant identified Amtrak travel records showing that AV-1 travelled by train between Milwaukee, Wisconsin, and Williston, North Dakota, approximately five times in 2011.

44.     Your Affiant further reviewed U.S. Bank records that show AV-1 made deposits of over $3,000 dollars on two occasions. On both occasions, similar amounts of cash withdrawals were conducted within a short time. Your Affiant further reviewed wire transfer records maintained by MoneyGram, which show AV-1 wiring over $43,000 from a Wal-Mart and an Albertson's store in Williston, North Dakota to a handful of people, to include R.R. and an adult female whose identity is known to law enforcement, hereinafter referred to as AF-1, between May and October 2011.

45.     In addition to conducting large cash and wire transactions, AV-1's financial records identified purchases related to the commercial sex industry – such as paying for a room at a hotel close in time to paying for an ad on Backpage.com. For instance, subpoenaed records show that on May 25, 2011, AV-1 conducted a Green Dot Bank prepaid card transaction for $92.10 at the Super 8 Motel in Williston. The next day, on May 26, 2011, the card records reflect a $2 transaction with Backpage.com. As another example, subpoenaed TCF Bank records for May 27, 2014, show three transactions of $7 each for Backpage.com and two transactions of $76.26 for Priceline Hotels.

46.     After several instances of leaving and returning to Adams only to experience the same treatment as before, AV-1 began to listen to friends who had been telling her that Adams was not her boyfriend, but her pimp. AV-1 had previously been naïve to the relationship dynamics, and she was unfamiliar with what a pimp was. AV-1 eventually realized that Adams would never follow through on his promises to let her leave the prostitution lifestyle and start her own business.

22

47.     In February 2019, AV-1 left Adams after he refused to give her money to buy her goddaughters Easter baskets before returned to North Dakota, telling her, "I'm not giving you no fucking money. Fuck them kids." AV-1 had reached a breaking point with Adams' disrespect, and she felt disgusted selling her body for him when that was not how she wanted to earn money. By that time AV-1 had an apartment and a car in her own name, and for the first time she no longer feared that leaving Adams would mean she would be homeless. AV-1 took advantage of these circumstances to leave Adams for good, and she did not return to him after that.

48.     AV-1 admits that it is difficult to recall instances of Adams' violence against her because she has actively tried to block her experiences with him from her mind. Your Affiant has reviewed reports of interviews with numerous other witnesses, however, who recall hearing about or witnessing Adams' violence toward AV-1. For example, on March 14, 2016, an adult female whose identity is known to law enforcement, hereinafter referred to as AF-2, described Adams as a "gorilla pimp," meaning a trafficker who controls his victims through using physical force, who said she witnessed Adams hit AV-1.

49.     On July 31, 2014, an adult female whose identity is known to law enforcement, hereinafter referred to as AF-3, was interviewed by an FBI agent and Fargo Police Department detectives. AF-3 stated that Adams, whom she called "Will" had been known to hurt people if they did not bring him money. AF-3 said that Adams and AV-1 had big fights about money. Although AF-3 never witnessed Adams use violence, AV-1 told AF-3 that Adams hit her, and AF-3 saw scratches on AV-1's arms and neck.

50.     Another adult female whose identity is known to law enforcement, hereinafter AF-4, was interviewed by case agents on September 17, 2013. AF-4 said she believed AV-1 had been working for Adams since she was 16 or 17 years old and recruits other minors to work for Adams.

23

AF-4 stated that she knew AV-1 had gotten the "hot and cold treatment" from Adams, which she described as being beaten with an extension cord, then put in an ice bath. During a second interview on October 4, 2013, AF-4 stated that Adams gave AV-1 black eyes.

51.     On October 11, 2013, Confidential Human Source (CHS) CHS S-58479 (hereafter, CHS) conducted a one-party consent call with an adult female whose identity is known to law enforcement, hereinafter referred to as AF-5. CHS has a criminal history consisting of traffic violations and prostitution charges. CHS willingly provided information to law enforcement and was motivated to do so for monetary compensation and compelled to do so based on previous experiences with human traffickers. CHS received $1,300 in compensation while working as a CHS. CHS conducted a one-party consent call with AF-5, who is believed to have been a victim of Adams at one time. During the consent call, AF-5 said "her dude" was mad at Adams because Adams had beaten AV-1 with an extension cord.

52.     On October 11, 2013, case agents asked AV-4 to conduct a one-party consent call with an adult female whose identity is known to law enforcement, hereinafter referred to as AF-5, who is believed to have been a victim of Adams at one time. During the consent call, AF-5 said "her dude" was mad at Adams because Adams had beaten AV-1 with an extension cord.

**B.     Sex Trafficking of AV-2**

53.     Your Affiant has also reviewed law enforcement reports related Adams' trafficking of an adult female whose identity is known to law enforcement, hereinafter referred to as AV-2.

54.     Franklin Police Department and Milwaukee County Circuit Court records show that Adams was arrested for a domestic abuse offense against AV-2 that took place around 2:30 a.m. on September 1, 2013. On that date, Adams was taken into custody for Battery, False Imprisonment, and two counts of Felon in Possession of a Firearm. AV-2 reported that during an

24

argument about Adams "dating" other women, Adams repeatedly punched her on her arm and chest, and slapped her in the face. This caused visible injuries that were photographed, including significant bruising to AV-2's jaw and scratches on her back and legs. AV-2 told police that while Adams beat her, she was crying and begging Adams to stop. Adams told her, "I'll do you like all my bitches. I'll beat you up and you can leave once the sun comes up." Adams did not let AV-2 leave the residence until approximately until 8:00 a.m. Adams gave consent for officers to search the residence, and officers found two firearms in the trunk of a vehicle parked in the attached garage. Additionally, officers found a pistol magazine loaded with five rounds and a loose bullet in the nightstand in the bedroom. Officers also noted homemade wooden barricades on the front door.

55.      Adams was charged related to this conduct in Milwaukee County Circuit Court Case Number 2013CF4078. On February 27, 2014, he entered guilty pleas to False Imprisonment (Domestic Abuse) and Felon in Possession of a Firearm, both felony offenses. He was sentenced to three years' probation on July 30, 2014.

56.      Your Affiant has reviewed FBI records and the reports of fellow FBI agents that reflect that on September 6, 2013, AV-2 was interviewed by agents and disclosed the following details related to her relationship with Adams. AV-2 stated she first met Adams when she was 19 years old, in approximately 2009, while she was working as a waitress at Applebee's. AV-2 stated that she initially turned down Adams' urging that she begin stripping, however she eventually started dancing at the Crazy Horse strip club in West Allis, Wisconsin, to earn more money than she was making waitressing. AV-2 reconnected with Adams after he came into the club, and they began to be romantically involved.

57.     Initially, AV-2 did not know how Adams earned his money, but after she moved in with Adams, she learned that Adams was a pimp by hearing Adams talking on the phone. AV-2 described Adams' sex trafficking operation for agents, stating that he had several females working for him performing commercial sex acts. Adams sent these females to Williston, North Dakota, to perform commercial sex acts for approximately sixty days at a time. The females then returned to Milwaukee for thirty days. After thirty days, the females returned to North Dakota to work another sixty days. AV-2 stated Adams' "bottom" was R.R., and which she defined as the main female who worked for a pimp.

58.     AV-2 stated Adams talked about beating the females that worked for him. This caused AV-2 to fear Adams. AV-2 acknowledged prior instances of violence by Adams towards her, but she claimed to have provoked these attacks.

59.     AV-2 told police that throughout their relationship, Adams had not asked AV-2 to do commercial sex dates for him, but whenever they would argue, Adams would tell her she owed him money. When AV-2 told Adams she wanted to leave him, Adams claimed she had to repay him the money he had spent on her during their relationship. Adams told AV-2 that he had invested that money into her and that she could not end the relationship without paying Adams back. Initially, Adams told AV-2 that she owed him approximately $10,000 but that amount soon increased to $100,000.

60.     Adams then sent AV-2 to Williston, North Dakota, for her to earn back the money Adams told her she owed him. Adams paid for AV-2's train ticket. AV-2 said she intended only to dance at a strip club, however, there were waiting lists at the clubs there and AV-2 was unable to dance. As a result, AV-2 conducted prostitution dates instead.

26

61.     AV-2 could not remember which hotels she stayed at while in Williston, North Dakota, but stated she recalled that she stayed in the same room as R.R. Adams told AV-2 that R.R. would teach her everything she needed to know about conducting prostitution dates. Adams also instructed AV-2 to give all the money she earned to R.R.

62.     R.R. had several cellular telephones that she used to post advertisements on Backpage.com and set up dates, including for AV-2. AV-2 never saw the advertisements that R.R. posted. When a date came to their hotel room for AV-2, R.R. left the room.

63.     AV-2 recalled calling Adams for help after an intoxicated client had gotten aggressive and flipped the mattress in her room. Adams told AV-2 she was overreacting and to keep making money.

64.     For the five days AV-2 was in North Dakota, AV-2 conducted approximately fifteen to twenty prostitution dates and made approximately $7,000 to $8,000, which she gave to R.R. at Adams' direction.

65.     AV-2 had never conducted any prostitution dates prior to travelling to North Dakota to work for Adams. AV-2 only did the sex dates so that Adams could not say she owed him money when she tried to leave him.

**C.      Sex Trafficking of AV-3**

66.     Your Affiant and fellow investigators also conducted multiple interviews of a third adult female whose identity is known to law enforcement, hereinafter referred to as AV-3. In 2023, AV-3 disclosed that she was trafficked by Adams at various times between 2009 and 2019.

67.     AV-3 first met Adams in 2009 when she was 17 years old, approximately two months before she turned 18. Adams took AV-3 on dates and made her feel special. Shortly after

27

meeting Adams, AV-3 moved in with him. Adams promised AV-3 that he would buy her a car and get her a place of her own with furniture.

68. AV-3 stated Adams knew that she was 17 years old and that she was still in high school when she moved in with Adams. When AV-3 arrived at Adams' home, R.R. was there. AV-3 observed Adams become physically violent with R.R. From that time on, AV-3 tried to be on her best behavior to avoid being beat by Adams like R.R. was.

69. AV-3 stated she worked for Adams during two specific periods – one before and one after she had her child. During the first period, AV-3 began by stripping at a club called Pink Slip Adult Entertainment Club near St. Louis, Missouri to earn money for Adams. This lasted for only a few months. In August 2009, she went to Sturgis, South Dakota, during the Sturgis Motorcycle Rally, where she did her first commercial sex date shortly after she had turned 18 years old.

70. AV-3 recalled doing commercial sex dates for Adams in St. Louis, Missouri, and Williston, North Dakota. Adams had AV-3 work in Williston because there was a large clientele base of oil workers there. AV-3 worked out of different hotels but couldn't remember which ones. Adams would send AV-3 out of state for three to four months at a time.

71. AV-3 stated this first period of "working" for Adams lasted from August of 2009 to the fall of 2010. During this time, she would return to Milwaukee, Wisconsin, for two-week periods for "vacation." During the "vacation" time, she would stay at hotels, her apartment, or with family. After two weeks of "vacation," Adams would pressure her to go back out of state to work for him.

72. Adams would delay AV-3's "vacation" time to punish her if he didn't get money from her, making her stay one or more weeks longer to work. AV-3 recalled one time when she

28

was back home in Milwaukee, Wisconsin, on "vacation" after working for Adams in South Dakota. AV-3 was staying with family. She visited a friend, stayed for a while, and didn't get back to Adams right away. Adams was upset, asking where she had been, and started hitting her. Adams pulled out a taser and threatened her until she told him where she had been. AV-3 remembered thinking she had to keep Adams happy so he wouldn't beat her again.

73.     During the first period when AV-3 worked for Adams, Adams had R.R. in charge of overseeing his victims. R.R. took photos of AV-3 to use for prostitution dates while AV-3 was still 17 years old. The advertisements were posted on Backpage.com.

74.     R.R. instructed AV-3 on Adams' rules for dates. These included: always wear a condom; never kiss the customer; no dates with African American men; and hurry the date – meaning get the customer in and out as quickly as possible.

75.     R.R. set the prices for the commercial sex dates. AV-3 stated these ranged from $100 to $500 per date and were negotiated in advance of the date. Initially, R.R. collected all of the money AV-3 earned after each date. Later, Adams had AV-3 deposit money into bank accounts, send money in packages, and wire the money through Western Union. The money was sent to other people, never directly to Adams. AV-3 remembered sending money to R.R. and AF-1, which Your Affiant was able to corroborate with subpoenaed financial records. Adams told her how and when to send money and would have her take pictures of the tracking numbers, receipts, or shipping information. Adams would also have AV-3 send money using other people's names instead of her own name. Adams would have AV-3 send money once she and/or the other females had reached $5,000 or at the end of the week. AV-3 estimated she sent money to Adams over twenty times and made "a lot" of money for Adams. AV-3 stated Adams would get angry if he did not get money from the commercial sex dates.

76.     AV-3 explained that doing dates at the rate Adams wanted took a physical toll on her. AV-3 recalled having to go to the hospital in Williston, North Dakota, because she was in pain and was bleeding a lot. She thought she might have had a sexually transmitted disease from one of the dates. Adams, however, would not allow AV-3 or any of the other victims to turn down sex dates, even when they were tired, sick, or on their periods. If there was money to be made, they had to accept.

77.     AV-3 described Adams as a very violent person who frequently threatened her. Adams would beat her up by punching her in the face or ribs or threaten to hurt her. Adams also would take or threaten to take her belongings. These assaults and threats would happen when Adams wanted information from AV-3, or whenever AV-3 told Adams she wanted to leave him and stop doing commercial sex dates.

78.     AV-3 left Adams the first time after Adams stranded her and her friend in a hotel in Madison, Wisconsin. This occurred in the fall of 2010, around the time AV-3 became pregnant.

79.     AV-3 ended up returning to Adams around the summer of 2015, following a campaign by Adams, beginning by at least 2014, to get her to return to him. Your Affiant has reviewed Facebook records from AV-3's account, which were obtained via a federal search warrant. Messages between AV-3 and Adams were consistent with AV-3's account of being trafficked by Adams. For example, on January 29, 2014, Adams sent AV-3 a message trying to convince her to return to him. In those messages he wrote, in part, "I promise I won't try to control you I just love you so much you don't even know!" AV-3 replied, "I love being with u. I'm so happy when we're together. But u & I both knw wat it is. U want me to work for u. And believe me I would but I have to make my family proud. At the end of the day I really don't wana be a prostitute."

30

80.     Despite that reply, Adams eventually convinced AV-3 to return to working for him. Adams also had AV-3 recruit other women to work for him doing commercial sex dates. Adams would tell her what to post on Facebook in order to persuade other females to work for Adams. For example, on July 13, 2015, AV-3 posted a photo of a pair of white and pink Jordan tennis shoes with the caption, "No one has ever held me down like him. He ALWAYS makes sure I'm GOOD. As long as I do my part. He does his. If u knew better, U'd do better. Stack. Want for nothing. Simple." On September 11, 2015, AV-3 posted a photo of a designer MCM bag and shoes. The bag handles were still covered in plastic, and the shoes were positioned on top of a box with the MCM designer logo. The caption of the photo read "My daddy is better than yours." AV-3 explained that Adams told her to post these comments and photos in an effort to recruit additional females to conduct commercial sex dates for him.

81.     AV-3's Facebook messages also reflect that Adams was a pimp and that she was working for him. On October 17, 2015, AV-3 had a Facebook conversation with Facebook user "Pretty Jas" and disclosed that she had a "daddy." AV-3 also told "Pretty Jas" that "[m]ost females don't wana get involved with a P." Based on my knowledge, training, and experience, "P" refers to a pimp. AV-3 goes on to explain that Adams sends a lot of females out to North Dakota and Wyoming to work for him and that she had worked for Adams since she was 18 years old. AV-3 told one Facebook user that Adams is "good to his girls if they don't give him a hard time. As long as they down for him & make money he's a good man." AV-3 told that same user that the last time she was actively working for Adams, she was away for two months; this time she was expecting to be away for one month. Additionally, on October 25, 2015, AV-3 disclosed to a different Facebook user that she was working for a pimp and has been traveling to North Dakota and Wyoming to make money.

31

82.     During this second period, AV-3 worked for Adams doing commercial sex dates for about five to six months, up until Adams was shot and was subsequently incarcerated. During this period, an adult female whose identity is known to law enforcement, hereinafter referred to as AF-6, was Adams' bottom. AV-3 knew AF-6 from high school. This time, AV-3 secretly kept some of the money she made from her sex dates. AV-3 indicated she had learned how to "play the game" and made sure she did not make Adams angry to avoid her getting beaten.

83.     Your Affiant has reviewed Milwaukee Police Department records that reflect that on or about October 26, 2015, Adams was shot. Following the shooting, Adams was hospitalized, then arrested and incarcerated on violations of his probation from the case involving AV-2. AV-3 decided to leave Adams after the shooting. About two weeks later, she changed her phone number. Approximately one month later, AV-3's new boyfriend's car was vandalized. All the windows were smashed in, and all the tires were slashed. Adams contacted AV-3 from jail and told her that he was responsible for her boyfriend's car being vandalized.

84.     Your Affiant has reviewed the contents of a cellular phone which was seized from Adams at the time of the shooting. That phone contained substantial text communications between Adams and AV-3's phone number. The content of those communications was indicative of Adams trafficking AV-3, including AV-3 reporting how much money she had made and was sending Adams, and AV-3 telling Adams when she was on "outcalls," meaning commercial sex dates where the worker travels to the client.

85.     In many of messages, AV-3 calls Adams "daddy," which Your Affiant knows to be a term many sex traffickers require their victims to use to refer to them, and Adams chastises AV-3 for not earning enough money. In instances where AV-3 did not reply to Adams promptly, he became dramatic, telling her he was cutting her off, and it was her loss because he has always had

32

her back. In others, Adams is more directly bullying, calling AV-3 a bitch or weak and threatening to do things like bust the windows out of her car.

86.     Many of the messages corroborated what AV-3 recalled about Adams' instructions about posting on Facebook to recruit other females to "pay a pimp." They also show him divulging details about how he runs his victims, directing AV-3 where to send money, and promising AV-3 plastic surgery if she reaches a certain quota.

87.     The last time AV-3 had contact with Adams was in late 2018 or early 2019, when he reached out to her through Instagram after serving his prison sentence. She did not respond to his messages.

D.     **Sex Trafficking of AV-4**

88.     Your Affiant has also reviewed the reports of fellow law enforcement officers and other documents relating to the trafficking of a fourth adult female whose identity is known to law enforcement, hereinafter referred to as AV-4. Racine Police Department reports reflect that on November 15, 2014, officers organized an operation focused on the recovery of human trafficking victims. During the operation, undercover officers responded to an advertisement on Backpage.com and set up a commercial sex date with AV-4. When AV-4 arrived for the date, undercover officers detained her, and she was taken to the Mount Pleasant Police Department to be interviewed by investigators. She was subsequently interviewed by FBI agents as well.

89.     AV-4 disclosed that she had previously worked for a pimp named "Bill Bill," whom she identified from a photograph as Adams, from February 2012 to May 2013. AV-4 said Adams used his charm and money to attract females who were struggling. She explained that when she first met Adams, she had just turned 18 years old. At the time, she had a difficult home life, and she only had food to eat when it was provided at school. Adams pulled up to her in an expensive

33

car and began talking to her. He told her that he could offer her a better life, and that he would take care of her and teach her how to "make real money."

90. Adams told AV-4 that he had females working for him in North Dakota. Adams said the females did prostitution dates to make money for him and that they were well taken care of. Adams told AV-4 that she would be able to send money to her family if she would do the same. Adams told AV-4 that he loved her and that eventually she would fall in love with him too.

91. AV-4 noted that Adams had many luxury cars, including a Bentley, a Mercedes, and a pick-up truck, all of which were newer model years with custom white exteriors, red leather interiors, and white rims. He also wore expensive clothes and a gold and diamond watch. She was impressed by his wealth and believed he could improve her life as he had promised to do.

92. AV-4 gave Adams her phone number and Adams called her that same day.

93. The next day, Adams picked AV-4 up and took her to get a driver's license because she needed identification to ride the train. Once she had a license, Adams took her to the Amtrak train station in Milwaukee, Wisconsin, and gave her money for a ticket to Williston, North Dakota. Subpoenaed Amtrak records reflect a ticket was bought in AV-4's name to travel from Milwaukee to Williston on February 23, 2012.

94. Adams gave AV-4 a phone number of AF-6. When AV-4 arrived in Williston, North Dakota, she stayed at the Vegas Hotel, in a room with R.R., AF-6, and another female, whose identity is known to law enforcement, hereinafter referred to as AF-7. AF-6 set up a prostitution date for AV-4 within an hour of her arrival at the hotel.

95. R.R., AF-6, and AF-7 all posted advertisements for AV-4 on Backpage.com. AF-6 gave AV-4 instructions about how much to charge customers and how to collect money from them, including being sure to get the money before the date started and to hide the money right after she

34

received it. For the most part, AF-6 collected AV-4's money, however AV-4 sometimes gave it to AF-7. Either way, all of her money was turned over to Adams.

96.     R.R., AF-6 and AF-7 were responsible for sending the money the women earned from their sex dates to Adams via Western Union. On a few occasions, AV-4 was asked to send money via Western Union. She did so under her real name on some occasions, and under a fake ID that Adams mailed her on others. The money was sent to a recipient other than Adams that Adams collected it from. Adams also had a US Bank account that R.R., AF-6 and AF-7 deposited money into.

97.     AV-4 was never allowed to keep any of the money she made performing commercial sex acts, even to buy things she needed such as food or toiletries. R.R., AF-6 or AF-7 would decide when to buy such items for her.

98.     At first, AV-4 tried to keep track of how much money she was earning. AF-6 quickly told her that doing so was useless and that AV-4 would never see any of it because Adams was a pimp and would be keeping everything.

99.     AV-4 stated that Adams had several additional rules the females needed to follow. These included never looking another male in the eye, especially black males. Your Affiant knows that in the trafficking context, looking another pimp in the eye is a sign that a victim is "choosing up," meaning leaving her current pimp to work for the other one. Many pimps particularly forbid their victims from looking at black males because they believe they are more likely to be pimps. Additionally, the females were not allowed to speak with other men, in case they were pimps, and the females were not allowed to be in a romantic relationship with another person.

100.     During her time in North Dakota, AV-4 did approximately five to ten dates each day and charged $300 for sexual intercourse and oral sex. AV-4 did "two-girl special" prostitution

35

dates on multiple occasions with R.R., AF-6, and AF-7. AV-4 recalled that R.R. and AF-6 were nice to her at first but then began to treat her badly, not allowing her to have enough food or toiletries.

101.    AV-4 stated R.R. and AF-6 had been working in Williston, North Dakota, for years. They paid for their rooms on a monthly basis. R.R., AF-6, AF-7, and AV-4 stayed at a number of hotels in Williston, North Dakota, such as the Super 8 Motel, the Holiday Inn, and the Airport Inn. AV-4 recalled getting kicked out of one of the hotels because the hotel owner thought AV-4 was a minor.

102.    Adams did not travel out of state with his victims. Adams told AV-4 that "he was a pimp, and he didn't have to leave Milwaukee" because his girls did what he told them to do.

103.    Adams would normally allow his victims to return home after two weeks as long as they "behaved." If any of them misbehaved, they would not be allowed to come home and would have to continue working in North Dakota. Examples of misbehaving included getting too drunk or giving Adams attitude over the phone. AV-4 recalled that AF-6 would have to stay in North Dakota a lot and was not allowed to return to Milwaukee.

104.    Adams had originally promised AV-4 that she would only be in North Dakota for two weeks, however after a month of doing dates every day, Adams told her that she needed to stay even longer because Adams found out that AV-4 began a relationship with someone while she was in North Dakota. AV-4 explained one of the rules of pimping was that you were not allowed to be in a relationship with anyone else. AV-4 felt disillusioned because Adams had not kept his promises to let her send money home or given her the lifestyle he had promised.

105.    After approximately six weeks of working in Williston, AV-4 asked her brother to buy her a train ticket so she could come back to Milwaukee. Within a day or two of AV-4 returning

36

home, Adams began repeatedly calling her and would show up at her residence looking for her. Adams also contacted AV-4 via Facebook Messenger and told AV-4 to "come back to daddy." Adams promised her that he wouldn't be mad if she just came back to him. When AV-4 eventually relented and returned, however, Adams hit her as punishment for leaving him.

106.    Adams also hit AV-4 on at least one other occasion, when she did not answer a question he asked her quickly enough. AV-4 also saw Adams beat up other women. For example, she recalled seeing him punch AF-6 in her face when they were in the car together.

107.    AV-4 feared Adams, not only because he had hit her, but also because he had a lot of money. AV-4 believed he could use that money to pay others to harm her without getting caught.

108.    Subpoenaed Amtrak records reflect a ticket purchased in AV-4's name for travel from Milwaukee to Williston on February 23, 2012, and on April 21, 2012. After returning to Adams, AV-4 worked in Williston doing commercial sex dates for about a month at a time before coming home to Milwaukee for two weeks at a time, similar to the schedule he had his other victims on.

109.    When Adams allowed AV-4 to return to the Milwaukee area, he had her stay at a hotel in Glendale. Adams did not allow AV-4 to leave the hotel for any reason, and she had to rely on him to stop by and provide her with food. Adams would also have sexual intercourse with AV-4 when he "felt like dealing with her."

110.    AV-4 finally left Adams for good in approximately May of 2013. AF-6 began collecting some of the money she earned and allowed AV-4 to keep enough money for a bus ticket home. Thereafter, AV-4 supported herself by dancing at the Airport Lounge in Milwaukee. Although Adams came into the club in 2014 and tried to get AV-4 to return to doing commercial sex acts for him, AV-4 refused.

111.     During her interviews, AV-4 identified a photo of AV-1. She stated that AV-1 worked

for Adams when she was 17 years old, and that AV-4 had heard that AV-1 was again working for

Adams at the time of the interviews.

**E.     Sex Trafficking of AV-5**

112.     Your Affiant has also conducted multiple interviews with, and reviewed reports and

notes from other law enforcement officers' interviews of, a fifth adult female whose identity is

known to law enforcement, hereinafter referred to as AV-5. AV-5 disclosed that she was trafficked

by Adams in 2015.

113.     AV-5 was first identified at the Roosevelt Hotel in Williston, North Dakota in June

of 2015, when R.R. and two of Adams' other victims were arrested for a plot to extort money from

a commercial sex customer at Adams' direction. AV-5 was staying in the same room and was

interviewed. She provided some information at the time about R.R.'s role in managing and

collecting money from the women's prostitution dates, but she did not want to speak further at that

time. Later, in 2019, after participating in therapy and treatment as a sex trafficking survivor, she

agreed to provide additional details about her victimization.

114.     AV-5 stated she first met Adams while she was employed as a cocktail waitress at

Silk Exotic Milwaukee Gentlemen's Club in Milwaukee, Wisconsin. Adams asked her if she had

a "man," and she told him she was dating someone. Adams then told her to call him when she was

unattached. He also invited her to look him up on Instagram, where his profile name was "bill.bill."

115.     When AV-5 checked out Adams' Instagram account, she saw pictures of Adams

wearing expensive clothes and posing with lots of custom cars, including an Aston Martin, which

had white exteriors and red leather interiors.

38

116.     Shortly after this, AV-5 lost her job and her car. AV-5 had also developed an Adderall addiction due to working long, late hours and caring for her daughter during the day, and she was having difficulty affording the drug.

117.     On March 28, 2015, AV-5 messaged Adams on Facebook telling him she was ready to start making money. Adams replied that she should call him rather than using Facebook, and they would discuss the details then.

118.     Adams and AV-5 met in a parking lot where he had sex with her. Afterwards, Adams told AV-5 that he usually did not have sex with a woman until she worked for him. AV-5 thought the comment was strange.

119.     AV-5 asked Adams about how he could help her make money. Adams told AV-5 he owned an "escort" business and that the women who worked for him went on dates with men in other states that he lined up. Adams made it sound like these were casual dinner dates. AV-5 did not understand that Adams was talking about prostitution.

120.     Adams told AV-5 that he would be sending her to North Dakota for two weeks at a time, and that she would earn hundreds of dollars from each date. After that, she would be able to come back to Milwaukee to be with her daughter. He told her that she would quickly earn enough to get a new car and for housing for herself and her daughter.

121.     The next morning, Adams contacted AV-5 and said a black female whose identity is known to law enforcement, hereinafter referred to as AF-8, would be coming by to pick her up. AV-5 told Adams she was not ready. She quickly packed two duffle bags and arranged for her daughter to stay with her mother. AF-8 got AV-5 and drove her to a hotel in Milwaukee.

122.     Adams met AV-5 and AF-8 at the hotel, and he took AV-5 to a storage unit to show her four luxury cars, including an Aston Martin, all of which were white with red interiors.

39

123. Later, AV-5 and Adams stopped at a store. Adams questioned AV-5 about having money and told AV-5 she had to give him whatever she had. At the time, AV-5 had her debit card with her. Adams took the card and got her PIN number from her. He first made her withdraw $1,000 and give it to him. He then used the card himself and withdrew another $200.

124. AV-5 asked Adams how she would be able to get Adderall while in North Dakota. Adams told her that he would get it for her.

125. AV-5 stayed at a hotel in Milwaukee with AF-8 for two nights. During this time, they went out to bars, where everyone they met already seemed to know AV-5 was "Bill's girl." At the time, AV-5 made her feel important.

126. Adams then took AV-5 and AF-8 to the Amtrak station, where they boarded a train for North Dakota. Subpoenaed Amtrak records show they arrived in Williston on March 30, 2015. They then moved into a hotel called the Aspen Hotel, where R.R. was already staying.

127. AF-8 and R.R. laid out Adams' rules for how AV-5 should perform "escort" dates in her room at the Aspen Hotel. AV-5 was instructed to send a text message to AF-8, R.R., and Adams twice for every prostitution date—once when the customer arrived, and once when the customer left. Your Affiant has identified text messages taken from the phone seized from Adams in October 2015 wherein AV-5 reports the details of her dates to Adams. When the customer arrived, AV-5 was to collect a previously agreed upon amount of cash from the customer immediately. Then, AV-5 was supposed to hide the money in the bathroom before performing the specific sex act for the customer. Only after the money was collected and secured was AV-5 allowed to perform the sex date with the customer.

128. After the customer had left the hotel, AV-5 was required to turn over all the money to AF-8 or R.R., who would send it to Adams. If AV-5 needed money for anything—even a very

40

small amount of money—she had to request Adams' permission. This was confirmed by texts from AV-5 that Your Affiant found in Adams' phone, such as one where AV-5 asked Adams' permission to have $5 in quarters to do laundry. AV-5 tried to keep her requests to a minimum, but Adams still sometimes denied them.

129.    AV-5 was aware that Adams used violence against some of his victims, including R.R., AF-6 and AF-8. For example, AV-5 recalled that Adams beat up AF-8 outside of a bar and that she had a "big forehead as a result."AV-5 also recalled that Adams became upset with AF-6 because he did not like her hairstyle, which had a side part instead of a center part like he wanted. Adams sent AV-5 to the store on a pretext to buy him a tube of Ben Gay. When AV-5 returned from the store, Adams told her "I had to hit her. She was being so stupid."

130.    AV-5 stated that while Adams was never violent with her, he manipulated her into performing commercial sex acts for him. AV-5 felt that she was not in control of basic decisions for herself.

131.    While AV-5 was in Williston, Adams put R.R. in charge of dispensing drugs to AV-5. At first, Adams did not have any Adderall for AV-5, so he told her he wanted her to use cocaine instead. Later, Adams bought Adderall for her. Adams, through R.R., controlled AV-5's access to both of these drugs. AV-5 was allowed four Adderall pills or one gram of cocaine per day. Your Affiant has identified text messages in AV-5's phone wherein AV-5 asks permission to have another pill.

132.    Adams also dictated AV-5's physical appearance. He required her to wear hair extensions. He also told her that she needed to lose weight by wearing a waist trainer at all times except during dates and taking Phentermine, an appetite suppressant.

41

133.    Adams expected AV-5 to be ready to accept dates at all times. If she was not, Adams or the woman who set up the date for her would yell at her.

134.    Despite Adams' initial promises to AV-5, rather than having AV-5 stay in Williston a couple of weeks, Adams had AV-5 remain at the hotel for several months. It was not until the other women AV-5 was working with in Williston were arrested for blackmailing a john at Adam's direction in June 2015 that Adams finally brought AV-5 back to Milwaukee. Adams had previously instructed AV-5 that if she were ever to be arrested, she should refuse to talk. Adams told AV-5 she would only be charged with a prostitution misdemeanor, and he would bail her out. AV-5 was so convinced for Adams' power and connections, that at the time she was questioned by law enforcement in connection with the extortion plot, she believed it was a type of test that Adams had engineered to see whether she would be loyal to him.

135.    Adams got AV-5 a hotel room in Milwaukee, but he would not allow her to leave it. AV-5 told Adams that she wanted to go shopping, but he told her, "This isn't a vacation." AV-5 had thought she might finally receive her portion of her earnings from Adams while she was in Milwaukee, but he did not give her anything.

136.    Adams also had unwanted sex with AV-5 at the hotel. Because she was engaging in vaginal commercial sex acts with other men, Adams insisted on having anal sex with her instead, telling her "I'm not another trick." Adams also refused to use lube and was forceful with AV-5, causing AV-5 to cry.

137.    Adams then told AV-5 she needed to go back to North Dakota to make money for the other women's bail with AF-6, who would be supervising her going forward. Less than a week after AV-5 had returned to Milwaukee, Adams sent AV-5 to Gilette, Wyoming with AF-6. Although

AF-6 drove some of the way, she also made AV-5 drive for a substantial portion of the trip. AF-6 said they had to sleep in rest areas because they could not spend money on a hotel on the way.

138.     AV-5 realized Adams had no intention of giving her any of the money she made and that his promises had been lies. AV-5 then began trying to leave Adams.

139.     One of these times, AV-5 made it all the way to Minot, North Dakota. While she was there, however, Adams called AV-5 and told her that she needed to return to working for him, or he would call her mom and tell her that AV-5 was "hanging out with pimps and whores." AV-5 did not want Adams to contact her mother, so she returned to doing commercial sex dates for Adams.

140.     Several weeks later, AV-5 began talking to another man she thought she could use to help her get out of the situation with Adams. She asked for his help in getting back to Milwaukee, and she did not have any further involvement with Adams after that.

### F.     Sex Trafficking of AV-6

141.     On June 1, 2022, FBI National Threat Operations Center received a call from an anonymous individual stating that Adams, whom the caller said goes by the name of "Bill Bill," was a "pimp" in Wisconsin and was "trafficking" females. The caller stated that Adams was pimping three to four females at that time, and that one of the victims was Adams' girlfriend. The tipster identified Adams girlfriend by a variant of her first name. Her identity is known to law enforcement, and she is referred to hereinafter as AV-6.

142.     Your Affiant and fellow agents obtained and reviewed reports from the Village of Glenview Police Department in Illinois of a disclosure made by AV-6 on July 13, 2022, regarding Adams trafficking her for commercial sex using threats and violence. On that date, AV-6 was a walk-in patient at the Glenbrook Hospital Emergency Room (ER). Medical records listed the

43

reason for AV-6's visit as a physical assault. AV-6 told the medical providers at the hospital that her pimp had been beating her. AV-6 informed the ER employees that the abuse has been ongoing for five years in many states. AV-6 was described as tearful and requesting to speak to law enforcement.

143.    On July 13, 2022, officers of the Glenview Police Department responded to Glenview Hospital to interview AV-6. Upon their arrival, they noted that AV-6 was crying and distraught. AV-6 reported that her "pimp," William or "Bill Bill," was forcing her to engage in prostitution. AV-6 stated that she worked at a strip club called Club 390 in Chicago Heights and that Adams required her to recruit customers and perform commercial sex acts out of that club.

144.    AV-6 stated Adams had recently been texting her demanding that she earn him more money and telling her to kill herself. AV-6 said Adams had not been violent with her recently; however, he had beaten her on other occasions in the past. AV-6 told law enforcement that she had taken an Uber to the hospital because she was scared and had nowhere to go.

145.    When asked for additional details about Adams and the situation, AV-6 told law enforcement that she was afraid for her life and no longer wanted a report to be taken or to receive assistance from law enforcement. Later that night, however, AV-6 called 911 to give additional information about Adams. She stated Adams was a black male and that he lived somewhere in Wisconsin but had been making her prostitute in the Chicago Heights, Illinois area. She indicated she was staying in hotels while working in Illinois. She also stated that Adams was planning on moving to Florida and that she believed he would force her to come with him.

146.    AV-6 provided phone number 262-393-9421 for Adams. When this number was searched in CLEAR, an online database which collects public records documents, Adams was listed as the user. Investigators noted and that while Adams' previous address was in Milwaukee,

his address at that time was in Wilton Manors, Florida. AV-6 requested that law enforcement document her disclosures in a report and indicated her willingness to sign a complaint.

147.    On July 14, 2022, AV-6 called the Glenview Police Department to ask for an update on their investigation into the disclosures she had made the day before. AV-6 told officers she feared for her safety because Adams had a key to her apartment on Waterview Drive in Northbrook, Illinois. She said she planned to leave that day; however, she was afraid that Adams would show up in the meantime. Officers told AV-6 they had called Adams and left him a voicemail stating that AV-6 did not want him to take her money and that she did not want to prostitute for him anymore.

148.    On February 28, 2024, case agents served a Grand Jury subpoena on Club 390 in Chicago, Illinois, for employment records for AV-6. The club bookkeeper provided employee records for AV-6 that listed her emergency contact as "Bill" with the phone number AV-6 had given to Glenview PD investigators.

149.    On May 24, 2024, Your Affiant and fellow investigators met with AV-6 at the Super 8 Motel located in South Holland, Illinois. AV-6 estimated that she had first met Adams thirteen years earlier through a mutual friend while dancing at On the Border in Franklin, Wisconsin. At the time, AV-6 claimed she had not been working for Adams for a few years; however, she said she still talked to him daily and was fearful of cutting ties with him.

150.    In early to mid-June 2024, case agents received several telephone calls and text messages from AV-6 from phone number 312-909-XXXX. In these calls and messages, AV-6 disclosed that Adams continued to be mentally and physically abusive toward her. AV-6 stated she had been with Adams for the last seven years and described them as "seven years of hell."

151.    In several of her communications, AV-6 indicated that she could not or should not speak to law enforcement because Adams knew or was going to find out that she was talking. AV-

45

6 admitted to investigators that she had told Adams that she was in contact with agents of the FBI. Adams told her that his lawyer had told him, "Your girl shouldn't be talking to them," referring to the case agents. She also indicated that Adams had directed her to cease contact with the agents and made her block the agent's phone number.

152.    On June 13, 2024, investigators spoke with AV-6's sister, AF-9. AF-9 said she had not heard from AV-6 for two years; however, AV-6 had reached out about a week earlier in distress. A.M. forwarded a photo of AV-6 via text message. The photo showed AV-6's face with significant swelling, as well as bruises and cuts, and a tattoo over her left eyebrow reading "Bill Bill" in cursive script. AF-9 said she had known AV-6 to be in an on and off again relationship with Adams for a long time and said Adams kept AV-6 away from her family. Additionally, AF-9 stated, her and her family are afraid of Adams and would be concerned for their safety if AV-6 came to visit and Adams knew where they lived.

153.    On June 14, 2024, AF-9 called agents to report that she had received a text message from AV-6 saying Adams had threatened to kill her the night before. AF-9 was concerned because she had been unable to get in touch with AV-6 since receiving that message.

154.    Investigators were able to contact AV-6 and asked about the photo she had sent A.M. of her face with injuries. AV-6 stated that photo depicted injuries she had sustained from Adams two years earlier during the COVID-19 pandemic. AV-6 explained that the day of this incident, she had worked a day shift at a strip club and accidentally put her phone in airplane mode when she tried to turn off Wi-Fi. AV-6 went to bed after her shift and was later awoken by Adams beating her. AV-6 stated Adams beat her because he was not able to track her via the "find my iPhone" locator function due to her phone being in airplane mode. AV-6 stated Adams broke her

46

ribs and that she had pain while breathing, but she did not go to the hospital or tell anyone that Adams had beaten her.

155.    AV-6 reiterated that Adams would check her location all day every day and would not allow her to go anywhere or do anything without his permission. As a result, AV-6 was depressed and suicidal. Adams told AV-6 nearly every other day, "Go drink some bleach; you'll die faster."

156.    On June 15, 2024, investigators received a call from AV-6, who stated that she had a call with Adams the previous day. During this call, one of AV-6's friends had been on the line without Adams' knowledge. During the phone call, Adams threatened AV-6 and told her, "Just know, I'm going to kill you." AV-6 also heard Adams call her a "police ass bitch" to his cousin.

157.    On June 18, 2024, investigators spoke by phone with AV-6's friend, AF-10. AF-10 recalled the call between AV-6 and Adams and said she had listened in with AV-6's permission, but without Adams' knowledge. During this call, Adams told AV-6 that he knew she was working with "the Feds." AF-10 said Adams was telling AV-6, "You're gonna die. You're gonna die." AF-10 indicated that on another prior occasion, she had heard Adams yell at AV-6 on the phone.

158.    On August 8, 2024, investigators received a phone call from AV-6 who stated that Adams had gotten upset with her on her birthday, beaten her, taken her money, and left. AV-6 stated Adams got upset because she was not making him as much money as he wanted from dancing and doing commercial sex dates, and because she had spent money on getting her hair done. AV-6 tried to tell Adams that the money she earned was hers, but Adams insisted it was his. Before Adams left, he told AV-6 he had to go talk with one of his other "hoes." Adams also tried to go through AV-6's phone and asked AV-6 again whether she had talked to the FBI. AV-6 stated she was scared that Adams would hurt her.

159.    AV-6 stated Adams had access to her residence and would show up unannounced. Adams would also track AV-6 through her phone and always knew her location. If AV-6 did not share her location, Adams would beat her.

160.    AV-6 stated she had to let Adams know whenever she bought anything, or Adams would get upset. Adams had control over her money and access to her bank account. AV-6 expressed wanting to meet with investigators in person but asked, "How could I when he knows my location?"

161.    On August 16, 2024, investigators spoke with AV-6 who explained she had performed commercial sex acts for Adams, starting in the Eastern District of Wisconsin and then moving elsewhere. AV-6 stated she used to dance at OTB in 2017, and she was introduced to Adams through a friend who also worked at OTB. According to Wisconsin Department of Corrections, Adams was released on extended supervision on November 28, 2017.

162.    AV-6 estimated it took approximately six months between when she first met Adams until she started performing commercial sex acts to make money for him. She would meet men at OTB and get their phone numbers. When she was done working her shift at OTB, Adams would take her phone and start texting the men, pretending to be her. Adams would set up sex dates with the men, set the prices, drive AV-6 to the location of the sex dates, and wait for her to be done. AV-6 was paid for the dates in cash, but Adams would take all the money.

163.    At the time of the interview, AV-6 admitted she still did the same work for Adams as she had since she first began working for him. Adams had a quota for her to make him at least $1,000 per day doing commercial sex dates. AV-6 stated that while Adams had previously used online advertisements for his victims, he had transitioned to having them find dates while dancing in strip clubs because he believed it reduced his risk of being charged with a crime.

48

164.     Adams would formerly check on AV-6 every day and either take the money she had earned directly from her or from her bank account.  At the time of the interview, however, he was not coming as frequently to collect from her because she did not earning as much money as before. AV-6 stated she used to make Adams around $10,000 per week and estimated she has made him well over a million dollars from commercial sex dates. More recently, Adams would beat AV-6 up and tell her that she was too broke for him.

165.     AV-6 stated she was scared and believed Adams would kill her for talking to the FBI. AV-6 stated she lived in Florida but would not provide law enforcement with a city or her address.

166.     Over the next several months, case agents had sporadic contact with AV-6, interspersed with periods when they were unable to reach her. When they did have contact with AV-6, she would explain that Adams had cut off her ability to communicate with the agents, threatened her with violence or homelessness, and repeatedly told her he hoped she would die.

167.     In September 2024, AV-6 informed Your Affiant that Adams had changed the access code for her apartment, effectively locking her out, because he felt she was not making him enough money. Adams' name was on AV-6 lease because he wanted to have control over her living situation.

168.     AV-6 disclosed that Adams would make threats about taking her vehicle or apartment if she did not make him enough money. AV-6 explained she was constantly fearful of not pleasing Adams because he could make her homeless.

169.     AV-6 also disclosed that Adams only uses the cellphone application Signal to communicate with her because the application does not store messages and auto deletes all

49

messages within five minutes. AV-6 said Adams insists on using Signal because he knows there is an investigation into his criminal conduct.

170.    In December 2024 and January 2025, case agents listened to recordings of calls Adams had with various inmates from various correctional facilities. In several of the calls, Adams talked about AV-6. For example, in a call between Adams and an inmate with the initials D.H. from the Racine County Jail that took place on November 16, 2024, the two men discussed cosmetic dentistry that several of Adams' victims had received. D.H. then asked Adams whether he was still with AV-6. Adams told D.H. that he had let her go. D.H. told Adams, "You got over a million dollars out of [AV-6]" and "You broke that bitch." Adams laughed in response to these statements. In another call Adams talked with an inmate with the initials K.L, from the Stanley Correctional Institution, that took place on December 28, 2024, K.L. referred to AV-6 as "that bad ass bitch that always got drunk and you had to beat up." Adams inferred from this description that K.L. was referring to AV-6, and K.L. confirmed that this was indeed who he meant.

171.    AV-6 finally cut ties with Adams in or around January 2025 after reconnecting with her family, who helped her leave Florida.

### G. Sex Trafficking of AV-7

172.    Your Affiant has also reviewed reports of other law enforcement officers' interviews of a seventh adult female whose identity is known to law enforcement, hereinafter referred to as AV-7.

173.    AV-7 disclosed that she AV-7 stated that she had met Adams when she had dinner with him and a mutual friend in approximately August 2015. Adams drove an Aston Martin and asked AV-7 to ride with him. During the ride, he talked about himself.

174.	During her first two social interactions with Adams, AV-7 observed Adams speak with AV-3, who was "out of town," via FaceTime video calls. She also saw him access his Instagram account on his phone, which she observed included many photos of women and cars, as well as posts about pimping and prostitution.

175.	Their second encounter, approximately two days after the first, involved dinner and a movie with another woman. AV-7 felt uncomfortable with them, so when the movie was over, she wanted to go home. Adams instead dropped the other woman off at her home, then took AV-7 to a Days Inn where AV-7 believed Adams knew the manager. Adams had sex with AV-7 at the hotel.

176.	The next morning, Adams talked to AV-7 about going "out of town" to an unspecified location to make money for him. He told AV-7 that that he would take a percentage of whatever she earned but that he would buy her a car and give her cash whenever she needed it. He told her she could leave that same day and that he would pay for her to get her hair and nails done.

177.	After this conversation, AV-7 met up with their mutual friend at an adult bookstore. AV-7 asked the friend to take her to her parents' home, but Adams insisted on taking AV-7 himself. Adams told AV-7 to pack a bag and that he would be back in a few hours to get her.

178.	When Adams came back for AV-7, he took her to get her hair and nails done. After this, Adams took AV-7 to the Amtrak station. Adams gave AV-7 money for a train ticket and told her to buy a ticket to Williston, North Dakota. AV-7 bought a one-way train ticket to Williston. Adams gave AV-7 AV-3's telephone number and told AV-7 to contact AV-3 when she arrived.

179.	During her interviews with law enforcement, AV-7 gave case agents one Amtrak ticket stub which showed it was for a trip to Williston on August 24, 2015.

51

180.    When AV-7 arrived in Williston, AV-3 picked her up in a silver Acura, which AV-3 stated belonged to Adams, and drove her to a hotel. AV-7 had to wait in the car while AV-3 did a commercial sex date in the room. Afterwards, AV-3 took AV-7 to another hotel and had AV-7 rent a room there because the management of the hotel "did not like" AV-3. Case agents obtained records showing that AV-7 checked into the Home Place Lodge and Suites in Williston on August 25, 2015, and stayed through August 31, 2015.

181.    From the time that they arrived at the hotel, AV-3 began talking to AV-7 about the details of doing prostitution dates. AV-3 told AV-7 that they did not have to worry about posting ads because another female in another state who also worked for Adams was posting ads for them.

182.    AV-3 had four phones; two were for incoming calls about dates for AV-7 and two were for AV-3. Initially AV-3 was taking the incoming calls for both AV-3 and AV-7 but later the calls went through the other out of state female. The female setting up the dates would tell AV-3 how much the date would be paying, and AV-3 would convey to AV-7 what the date had agreed to pay. The specifics of the sex act were not discussed with the customer prior to the date.

183.    As soon as AV-7 and AV-3 checked into their hotel room, AV-3 told AV-7 she had a date on the way. AV-7 was surprised and was not sure what to do. AV-3 gave AV-7 lubricants and condoms.

184.    AV-7 had to text AV-3 how much money she had received, and AV-3 would inform Adams. AV-7 would also text AV-3 when she was done with the date. AV-3 told AV-7 to get the money first and to hide the money in the Kleenex box in the bathroom or inside the toilet paper holder to keep it safe. At the end of each day, AV-3 would send the money that she and AV-7 earned to Adams via Western Union. Most dates were for about $300, but some were for $150 or $200.

52

185.     The first night, AV-3 and AV-7 had multiple commercial sex dates at their hotel room, followed by an outcall date at another hotel with five men. AV-3 and AV-7 were each paid $300 for the outcall, and AV-3 collected that money for Adams. Afterwards, one of the men asked to come back to AV-7's room with her in exchange for an additional $300. AV-7 persuaded AV-3 not to say anything to Adams so that AV-7 could keep the money for herself, but AV-3 was hesitant because she was fearful Adams would find out.

186.     The following morning, AV-3 told AV-7 that she had a date coming. AV-7 was tired and did not want to do the date. AV-7 told AV-3 to tell the unknown female who was setting up their dates that she was tired and busy. AV-3 left the room to receive the date. As soon as she did, AV-7 got a phone call from Adams, who immediately told AV-7, "You're tripping," and, "That is not how this works." Adams also told AV-7 she needed to be available at all times and that could not turn away dates. Following that call, AV-7 felt she had to accept any dates who came.

187.     AV-7 estimated that she did about 10 to 20 dates each day. AV-7 initially kept track of her dates and the amount of money she was earning, however, she eventually stopped when she realized that she was not going to receive any of the money she was making. AV-7 did not know the exact total she had made, but she knew it was over $8,000. Adams told the friend who introduced them that she had made him $15,000.

188.     AV-7 stated that while she was in North Dakota, AV-3 was allowed to use some of the money that she and AV-7 earned to buy food, however they very rarely bought other items. On one occasion, AV-7 wanted to buy an $8 bottle of shampoo at Walmart. When she put the shampoo in her shopping cart, AV-3 called Adams about it. When AV-3 got off the phone, AV-3 told AV-7 that Adams had directed her to put the shampoo back.

189.     Both AV-3 and Adams told AV-7 to delete all text messages from Adams and AV-3 from her phone as soon as they were read. Adams also instructed AV-7 not to save Adams' phone number under his actual name.

190.     Prior to leaving for Williston, North Dakota, Adams told AV-7 that she would be in North Dakota for two weeks. After some time had passed, AV-7 asked Adams for the date when she would be returning home. Adams told her that she would leave on September 13, which would have had her staying in Williston for three weeks instead of two. AV-7 was upset about the discrepancy between what Adams had promised and the reality, particularly because she knew AV-3 had been in North Dakota for six months. AV-7 was fearful that Adams would keep her in North Dakota even longer than September 13th and that he would keep postponing her return home to Milwaukee.

191.     AV-7 decided to leave Williston on her own. AV-7 contacted a previous commercial sex customer, and he took her to the train station. Surveillance in Williston showed that an unknown black male dropped AV-7 off at the Amtrak station on September 1, 2015. AV-7 used the $300 she had previously hidden from Adams to buy the return train ticket, which cost $270.

192.     On her way to the train station, AV-7 called Adams to tell him that because he had lied to her about only staying for two weeks, she had taken it upon herself to find her own way home. AV-7 started to tell Adams that she would call him when she was back in Milwaukee, but Adams told her not to bother.

193.     Other than the $300 that AV-7 hid for herself, Adams took everything AV-7 earned.

    F.     The Target Cell Phone

194.     Your Affiant is aware that Adams has been using phone number 262-393-9421 (the Target Cell Phone number) for several years. This number has surfaced at many different points

54

during the sex trafficking investigation. For example, on July 13, 2022, the victim referred to in the criminal complaint affidavit as AV-6 provided the **Target Cell Phone** number as Adams' number when she disclosed being trafficked by Adams to the Glenview Police Department. AV-6 also listed **Target Cell Phone** as her emergency contact on her employment applications for strip clubs in the Chicago, Illinois area.

195.    Adams also provided his phone number as the **Target Cell Phone** number on several lease agreements for apartments he has rented. Adams used the **Target Cell Phone** number on his lease agreement for the Arrive Glenview apartments located at 2550 Waterview Drive in Northbrook, Illinois, which he leased starting August 1, 2022. Adams also provided the **Target Cell Phone** number on his lease agreement for 10X Delray apartments located at 14050 Pacific Point Pl, Delray Beach, Florida, which he leased starting June 8, 2023.

196.    Recently, on October 1, 2025, Adams provided his phone number as **Target Cell Phone** to Milwaukee Police Department officers after he reported being robbed of gunpoint of $370,000 worth of jewelry and $980 in cash. The robbery reportedly took place at Hometown Gas Station, located at 3500 S. 13th Street, Milwaukee, Wisconsin.

197.    Even more recently, on or about November 21, 2025, Adams called Wisconsin DCI SA Jim Krueger from the **Target Cell Phone** number, asking whether he was still under investigation in this matter. Your Affiant is aware that on several occasions in the last few years, Adams has contacted agents from DCI or the FBI attempting to get information about whether he is under investigation for sex trafficking.

198.    Your Affiant is also aware, from communications with AV-6, that Adams has frequently expressed concern that he is being watched by the FBI and that he has taken steps to

avoid law enforcement from obtaining incriminating evidence against him, such as insisting on using encrypted messaging applications like Signal to communicate with her.

199.    On October 3, 2025, subscriber information and toll records were received for the **Target Cell Phone** number. The subscriber was listed as Donna Williams with an activation date of January 4, 2014. Your Affiant is aware that Ms. Williams has children in common with Adams.

200.    On December 4, 2025, the Honorable William Duffin, United States Magistrate Judge, authorized a criminal complaint and arrest warrant for Adams based on the above-described in violations of Title 18, United States Code, Sections 1591(a)(1), (b)(1) and (b)(2) (sex trafficking of a child and/or by force, fraud, or coercion); 1591(d) (obstruction or interference with sex trafficking enforcement); 1594(c) (conspiracy to commit sex trafficking); and 2421(a) (interstate transportation for prostitution). Judge Duffin further authorized a warrant for prospective cell phone location data (hereafter, "ping data") for Adams' cellular telephone bearing the phone number 262-393-9421.

201.    The cell phone provider for that number, T-Mobile, responded to the warrant with a description of the device and location data for the device bearing that phone number. The device was described as an Apple iPhone 12 Pro Max bearing IMEI 354876502958338. The ping data for that device showed Adams phone was in the Saukville, Wisconsin area over night from December 5th to December 8th, 2025. The "ping data" provided by the provider included an approximate latitude and longitude for the phone's location, as well as a "radius" measurement which indicated how precise those coordinates are. Most of the ping radius were a minimum of approximately 0.8 miles while the phone was pinging in the Saukville area overnight. The ping data also showed the phone was in the Cedarburg, Port Washington and Milwaukee areas at various afternoons and

56

evenings. However, ping data showed the phone only stayed overnight in Saukville area from December 5 to December 8, 2025.

202. Based upon my training and experience, the investigation to date, and information obtained from other law enforcement officers, I am aware that sex traffickers commonly maintain evidence of their sex trafficking on their cell phones and other electronic devices. Case agents are also aware it is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. Because sex trafficking generates large sums of cash, it requires the laundering of the proceeds through bank accounts, purchases of jewelry, clothing, vehicles, residential real properties, or other expenditures, which by their nature involve financial records. Such financial records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the unlawful proceeds on the trafficker's behalf. These records, unlike controlled substances or other types of physical evidence, are often maintained for long periods of time, even several years, based on case agents' training and experience.

203. The information set forth above suggests that this general learning and knowledge are true as to Adams. As detailed above, during the time periods described in paragraphs 6-193, Adams frequently used his cell phone messaging function to communicate with, coordinate, and control human trafficking victims. Affiant has reason to believe such communications may be stored on Adams' cellular devices, including the Target Device. On September 17, 2024, AV-6 provided information that Adams has at least two cell phones and insisted her using the encrypted messaging application Signal to communicate with her. Your Affiant knows that messages sent from encrypted messaging applications, like Signal, may be able to be obtained from a download of the device itself, even when they are unable to be obtained through legal service served on the

57

encrypted messaging application service provider. Adams is also known to use his social media platform to recruit and communicate with victims. Your Affiant also knows that messages sent from Facebook messenger now uses end-to-end encryption for all personal messages and calls by default. These messages may then be able to be obtained from a download of the device itself, even when they are unable to be obtained through legal service served on the social media company.

204. Based on Adams' history of using this same phone number, your affiant believes Adams currently possesses the cellular phone and will be in the possession of this phone at the time of his arrest. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

## IV. TECHNICAL TERMS

205. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text

58

messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

59

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and

60

presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

206. Based on my knowledge, training, and experience, as well as my conversations with other Special Agents of the Federal Bureau of Investigation, who are experienced with electronic communication systems, I know that the electronic Devices described above have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## V.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

207. Based on my knowledge, training, and experience, as well as my conversations with other Special Agents of the Federal Bureau of Investigation, who are experienced with electronic communication systems, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Devices. This information can sometimes be recovered with forensics tools.

208. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of use, who used it, and when.

61

209. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

210. *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

211. *Biometric Authorization.* The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

   b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a

feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using

64

one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of William C. Adams to the fingerprint scanner of the device; (2) hold the device in front of the face of that individual and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **CONCLUSION**

212.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## **REQUEST FOR SEALING**

213.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

65

## <u>ATTACHMENT A</u>

The person to be searched is William C. Adams. The property to be searched is an Apple iPhone 12 Pro Max bearing cell phone number 262-393-9421, as well as any other devices located in the possession of William C. Adams.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## <u>ATTACHMENT B</u>

1.      All records on the Devices described in Attachment A that relate to violations of

Title 18, United States Code, Sections 1591(a)(1), (b)(1) and (b)(2) (sex trafficking of a child

and/or by force, fraud, or coercion); 1591(d) (obstruction or interference with sex trafficking

enforcement); 1594(c) (conspiracy to commit sex trafficking); and 2421(a) (interstate

transportation for prostitution)and involve Willaim C. Adams since January 1, 2009, including:

> a.  All stored electronic communications, including email, instant messaging, text messaging, multimedia messaging, and communications in third party apps;

> b.  All contact lists and records of communications with those contacts, including call logs and written messages of any kind;

> c.  All images, videos, travel records, information related to the identity of victims, and any other content or records on the phone.

> d.  All photographs or videos;

> e.  All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, and Internet Protocol addresses;

> f.  All web browsing history;

> g.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, and saved usernames and passwords.

As used above, the terms "records" and "information" include all of the foregoing items of

evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage and any photographic form.

2

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of William C. Adams to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face of William C. Adams and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

3